IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 19–01–BU–DLC |
| Plaintiff, | |
| vs. | ORDER |
| ROBERT LEE CRAWFORD, | |
| Defendant. | |

Before the Court is Defendant Robert Lee Crawford's Motion to Suppress

Evidence (Doc. 25). Crawford is charged with two counts of being a prohibited

person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Crawford

seeks to suppress evidence of the firearms and ammunition providing the basis for

these charges on the grounds that the Butte Probation and Parole Officers who

discovered the evidence lacked justification to search his residence and, later, to

arrest him. (Doc. 26 at 2.) The Court held a hearing on this Motion on June 6,

2019. For the following reasons, the Motion will be denied.

FACTUAL BACKGROUND

After being released on parole from Montana State Prison, Crawford first

reported to a probation and parole officer on January 10, 2018. (Doc. 26-5 at 1, 5.)

Crawford's supervision was transferred to the Butte, Montana, division of parole

services and he was ultimately assigned to Butte Probation and Parole Officer Dan Blando. (*Id.* at 1, 4–5.) Of importance in this case, Crawford's conditions of supervision included the following:

> ILLEGAL DRUG USE: I will not possess or use illegal drugs. I will not be in control of or under the influence of illegal drugs, nor will I have in my possession any drug paraphernalia.
>
> .   .   .
>
> WEAPONS: I will not use, own, possess, transfer, or be in control of any firearms, ammunition (including black powder), or weapons. I will not possess chemical agents such as O.C. or pepper spray.
>
> .   .   .
>
> NO ASSOCIATION: I will not knowingly associate with probations, parolees, prison inmates, or persons in the custody of any law enforcement agency without prior approval from the Probation & Parole Officer outside a work, treatment, or self-help group setting. I will not associate with persons as ordered by the court or BOPP. The Defendant shall not associate with persons who abuse alcohol, use illegal drugs, or otherwise violate the law.

(Doc. 26-2 at 1–2.) In addition to these and other conditions, Probation Officer Blando restricted Crawford's ability to travel. Crawford was only permitted to leave Butte in order to report to work in Helena, Montana, and was required to return home to Butte daily after work. (Doc. 26-5 at 4–5.)

Initially, Crawford appeared to be materially compliant with the conditions of his supervision and with the requests of Probation Officer Blando. However, it was not long before problems arose. On June 25, 2018, Crawford failed to report

at the designated time.  Crawford explained that he had stayed overnight in Helena, despite lacking permission to do so, and stated that he would report to Blando by the end of the day.  However, Crawford again failed to report.  The next day, Crawford finally appeared, "look[ing] terrible."  Suspecting drug abuse, Blando requested a urinalysis sample.  Crawford eventually admitted to using THC, methamphetamine, and alcohol while camping out at Delmoe Lake.  In response, Blando referred Crawford to the resources that had been set up to help him with his addiction and scheduled Crawford to report again on July 9, 2018.  (Doc. 26-5 at 4.)

Sometime around the June 25, 2018 incident, Blando's supervising officer, Probation Officer Tony Barrett received information from trusted informants indicating that Crawford was involved in selling drugs and was carrying a weapon. (Doc. 28-3 at 8–10.)  Based on that information, Barrett told Blando not to have any contact with Crawford outside of the office and decided to watch Crawford more closely.  (Doc. 26-5 at 4.)  Additionally, Blando was informed that the ATF had begun to watch Crawford.  (Docs. 26-7 at 63; 26-5 at 4.)

On Saturday July 7, 2018, Lewis and Clark County Sheriff's Department received information indicating that individuals in a "white pickup" were at a known drug house in Helena and were involved in "running drugs."  (Doc. 26-4 at

1.) Lewis and Clark County Sheriff's Department officers surveilling the home observed a white Dodge Dakota pickup leave the residence. Officers followed the pickup and initiated a traffic stop when the driver of the vehicle, Crystal Gilbreath, failed to signal before turning. (*Id.*) Approaching the vehicle, officers noticed that there were gun cases in the back of the cab, and that there were two passengers, Crawford and Caitlin Dreesen. (Docs. 26-3 at 1–2; 26-4 at 1–2.) Crawford told the officers that he was on "probation" and it was soon discovered that Dreesen was a probation absconder with an outstanding warrant for her arrest. (Docs. 26-3 at 1; 26-4 at 1; 26-5 at 3.) Dreesen was arrested and placed in the back of a patrol car. (Doc. 26-3 at 2.)

Gilbreath informed the officers that all of the guns in the vehicle were hers and "went on a long, rambling story" about how she carried them with her because she was locked out of her gun safe. (Docs. 26-3 at 1; 26-4 at 1–2.) However, when asked about what type of gun was in the top case in the vehicle, Gilbreath could provide no more detail than stating that it was "the cool one." (Doc. 26-3 at 1.) Gilbreath informed the officers that there were two more handguns in her purse which was in the back of the vehicle and another between the front seats. (Docs. 26-3 at 1–2; 26-4 at 1–2.) Officers also noticed a butane torch on the floorboard of the vehicle. (Doc. 26-4 at 2.) Additionally, when officers brought a drug dog to

the vehicle, the dog made positive indications that drugs were present in the vehicle. (Doc. 26-4 at 2.) Based on all of the information gathered at the scene, the officers seized and impounded the Dodge Dakota so that they could search it later, after obtaining a warrant. (Doc. 26-3 at 2–3.)

Lewis and Clark County Sheriff's Department officers also called the Butte Probation and Parole office and spoke to Probation Officer Adolfo Tellez, the on-call probation officer that day. (Docs. 26-3 at 3; 26-7 at 11.) Tellez informed the officers that he wished to have Crawford detained for being a felon in a vehicle with a firearm and for unapproved travel outside of Butte. (Docs. 26-3 at 3; 26-5 at 3.) Accordingly, Crawford was arrested and taken to the Lewis & Clark Detention Center. (Doc. 26-3 at 3.)

On Monday, July 9, 2018, Lewis and Clark County Sherriff's Department officers obtained a search warrant for the Dodge Dakota and arrived at the impound lot to find that the vehicle had been broken into over the weekend. The guns, cases, and luggage which had been seen in the vehicle during the stop had all been removed. Accordingly, the investigation was terminated and no charges were pursued as a result of the traffic stop. (*Id.*)

Based on the information received from informants that Crawford was carrying a firearm and selling drugs, as well as the fact that Crawford had just been

arrested in a vehicle with firearms in Helena, Probation Officer Barrett authorized a search of Crawford's residence in Butte. (Docs. 26-7 at 9–10; 28-3 at 4, 8–9.) Probation Officers Blando, Jacob Miller and James Cameron, as well as local police officers proceeded to Crawford's residence and gained access to the home through an open window. (Doc. 26-7 at 18.) Inside they found alcohol, a meth pipe, loose ammunition, a sword, and several long daggers. (Doc. 26-5 at 3; 26-7 at 22–23; 28-1 at 5–6; 28-2 at 8–9.) They also found a large gun safe in Crawford's bedroom. (Doc. 28-3 at 4.) Officers then proceeded to the garage, which was padlocked shut. (Doc. 26-7 at 30.) Probation Officer Cameron kicked the door in after receiving permission from Supervising Probation Officer Bud Walsh to gain access with force if necessary to complete their search. (Docs. 26-7 at 29; 28-2 at 42–43.) Inside, officers found chemicals known to be used in the process of manufacturing methamphetamine. (Docs. 26-5 at 3; 26-7 at 39.) Outside the garage, they also found a vehicle that was registered to a known absconder. (Doc. 26-7 at 41–42.)

Concerned about what could be in the safe and unable to gain access to it, Crawford was contacted at the Lewis and Clark Detention Center and asked about the code. Crawford stated that "he did not know the code and that it was not his safe," it was his girlfriend's, but that she did not know the code either. (Docs. 26-5

at 3; 26-6 at 1.)  Before leaving, Probation Officer Blando saw Crawford's

girlfriend, Crystal Gilbreath, drive up to the house and he asked her about the safe.

Gilbreath told Blando that it was not her safe and that she did not have the

combination to it.  (Doc. 26-6 at 1.)  The officers decided to confiscate the safe and

transport it to the Butte-Silver Bow Detention Center so that they could keep the

safe under their control until they could gain access.  (*Id.*)

     After unsuccessfully attempting to get the code from Crawford and

attempting to contact the manufacturer of the safe for an override code, Probation

Officer Miller was told by a safe salesman that the best way to gain access "would

be to cut through the side with a grinder."  (*Id.*)  Accordingly, Probation Officers

Miller, Barrett, and Tricia Jory met with Butte-Silver Bow Police Department

Sergeant Chris Berger and other officers at the Butte-Silver Bow Detention Center

on the afternoon of July 18, 2018 to gain access to the safe.  (Docs. 26-6 at 1; 26-

11 at 1–4; 26-12 at 1.)  Once Probation Officer Miller cut a square hole in the side

of the safe, officers searched the safe and found four handguns, an assault rifle,

ammunition, a bill of sale for a vehicle Crawford had purchased, a receipt for

towing services Crawford had paid for, a stamp collection, and some of Crawford's

banking documents.  (Docs. 26-6 at 1–2; 26-11 at 4; 28-3 at 43; 34-1 at 3–6.)

During the process of cutting open the safe, Probation Officer Barrett recalled that

Officer Berger mentioned that Crawford had "physically assaulted his girlfriend within the past couple days and that his girlfriend had active drug related warrants." (Doc. 26-12 at 1.) Based on the weapons and everything that had occurred up to that point, Probation Officer Barrett felt that "there was enough reasonable suspicion and enough information that . . . [Crawford was] a safety concern." (Doc. 28-3 at 13.) Accordingly, Barrett decided that the officers would "actively seek Crawford and take him into [c]ustody." (Doc. 26-12 at 1.) Probation Officer Cameron was then sent to watch for Crawford's arrival at his residence. (Docs. 26-13 at 1; 28-2 at 14–15.)

Cameron reported seeing a male leave the residence on a motorcycle with a female passenger, as well as seeing several other vehicles and individuals coming and going from the house. Cameron reported that he believed Crawford to be the individual driving the motorcycle. Probation Officers Barrett, Walsh, and Miller joined Cameron at the house to wait for Crawford to return home. Butte-Silver Bow Police Department Sergeant Berger was informed of the probation officers' plan to arrest Crawford and their location. (Doc. 26-14 at 1.) At approximately 11:30 that evening, Crawford was identified driving a black Harley Davidson to the house with a female passenger riding pillion. (Docs. 26-13 at 1; 26-14 at 1.)

As soon as Crawford backed the motorcycle into his driveway, the probation officers moved in to make the arrest. Probation Officer Barrett announced the probation officers' presence and told Crawford and the female to show their hands. (Docs. 26-14 at 1; 28-3 at 24.) The female promptly complied with the probation officers' commands but Crawford tried to elude the officers before tripping and falling to the ground next to a Dodge Dakota parked in his driveway. (Docs. 26-14 at 2; 28-1 at 21.) Probation Officer Miller saw Crawford's arms go under the vehicle as he fell. (Doc. 26-14 at 2.) Crawford tried to get back up and run but was forced down and handcuffed before he could do so. (Docs. 26-14 at 2; 28-1 at 23.) Once Crawford was restrained, the officers looked under the Dodge Dakota and saw a tan-colored Glock pistol and a small, zippered, black bag. (Docs. 26-13 at 1; 26-14 at 2; 28-1 at 23.)

Miller notified the Butte-Silver Bow Police Department that Crawford was in custody and police officers were dispatched to the scene to take Crawford into detention. (Doc. 28-1 at 22–23.) Butte-Silver Bow Police Officer Bryan Ellingson and Lieutenant Josh Moore arrived and collected the firearm and secured it in evidence before transporting Crawford to the Butte-Silver Bow County Detention Center. (Doc. 26-14 at 2.) The pistol had "16 rounds in the magazine and 1 round in the chamber" and was discovered to be stolen. (Doc. 26-15 at 4.) Officer

Ellingson also assisted Probation Officer Miller in searching the black bag and taking pictures of its contents. Inside the bag were several zip-lock bags containing "a white crystalline substance, . . . what appeared to be psychedelic mushrooms, . . . white pills, . . . [and] a dark brown substance." (Docs. 26-14 at 2; 26-15 at 4–5.) Also in the bag were "two empty syringes and paperwork with Crawford's name and date of birth on it." (Docs. 26-14 at 2; 26-15 at 5.) The bag was taken as evidence by Officer Ellingson. Lieutenant Moore ran the license plate on the Harley Davidson and discovered that it, too, was reported stolen. (Docs. 26-14 at 2; 26-15 at 4–5.) The officers searched Crawford's residence and secured it before leaving. (Doc. 28-1 at 31–32.)

The morning after the arrest, at around 9:20 on July 19, 2018, Probation Officer Blando was informed of what happened with Crawford and was asked to issue a warrant to the Butte-Silver Bow County Detention Center. (Docs. 26-5 at 2; 26-7 at 46–47.) Probation Officer Blando prepared the warrant and faxed it to the detention center. (Doc. 26-7 at 47–48.) The warrant was received by the detention center at 11:55 a.m. on July 19, 2018. (Doc. 26-18 at 1.)

Count I of the Indictment charges Crawford with being a felon in possession in relation to the firearms found in the safe in his bedroom. Count II charges

Crawford with being a felon in possession in relation to the firearm Crawford had on the evening he was arrested.  (Doc. 1 at 1–3.)

DISCUSSION

Crawford advances three arguments in support of suppression.  First, Crawford argues that the search of the gun safe located in his bedroom was an unreasonable extension of the warrantless search permitted by his parole conditions.  (Doc. 26 at 14–16.)  Second, Crawford asserts that the probation officers did not have reasonable grounds to arrest Crawford on July 18, 2018.  (*Id.* at 18–21.)  And, lastly, Crawford argues that his arrest violated Montana law.  (*Id.* at 21–27.)  The Court addresses each of these arguments in turn.

## I.    The search of the safe.

Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).  One such exception is when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirements impracticable."  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal quotation marks and citation omitted).  Supervision of probationers and parolees is considered a "special need" which permits "a degree of impingement upon privacy that would not be constitutional if

–11–

applied to the public at large." *Id.* at 875. This is because the restrictions placed upon these individuals are intended to provide a "period of genuine rehabilitation" while also ensuring the safety of the community while the supervisee is "at large." *Id.* Accordingly, the goals of probation and parole "require and justify the exercise of supervision to assure that the restrictions are in fact observed." *Id.*

To this end, probation and parole searches are permissible when conducted pursuant to state law that satisfies the reasonableness standard of the Fourth Amendment. *United States v. Conway*, 122 F.3d 841, 842 (9th Cir. 1991). The reasonableness standard balances the "special law enforcement needs supporting the state law scheme against the probationer's privacy interests." *Id.* In Montana, it has been recognized that requiring probation officers to obtain a warrant before searching probationers and parolees would squander the probation officer's expertise and experience with the supervisee and, ultimately, place the "independent magistrate" issuing the warrant in the position of making supervisory decisions, "substantially inhibiting the effectiveness of the probation system." *State v. Burke*, 766 P.2d 254, 256 (Mont. 1988). These special law enforcement needs are then balanced against the privacy interests of a parolee or probationer, which are indisputably "reduced." *Id.* at 257. Parolees, particularly, enjoy "fewer expectations of privacy than probationers, because parole is more akin to

imprisonment than probation is to imprisonment." *Samson v. California*, 547 U.S. 843, 850 (2006) (internal quotation marks and citation omitted).

Consistent with the United States Supreme Court's balance of these interests, Montana law authorizes warrantless searches when a probation officer has "reasonable grounds" to believe that a supervisee has violated the conditions of his release. *Burke*, 766 P.2d at 255–56 (citing *Giffin*, 483 U.S. at 873–76). The "reasonable grounds" standard, also referred to as the "reasonable suspicion" or "reasonable cause" standard, is "substantially less than the probable cause standard required by the Fourth Amendment because of the probationer's diminished expectation of privacy." *State v. Moody*, 148 P.3d 662, 665 (Mont. 2006) (internal quotation marks and citations omitted); *see also State v. Beaudry*, 937 P.2d 459, 460–61 (Mont. 1997) (discussing "reasonable cause" standard). Accordingly, a probation officer may search a supervisee's person, vehicle, and residence and the supervisee must submit to such search, upon the probation officer's reasonable suspicion that the offender has violated the conditions of his supervision. *State v. Conley*, 415 P.3d 473, 476 (Mont. 2018). The reasonable cause test is "a fact-driven test inasmuch as the search 'should be permitted only if there is an underlying factual foundation justifying the search.'" *State v. Beaudry*, 937 P.2d 459, 462 (Mont. 1997) (quoting *Burke*, 766 P.2d at 257).

Crawford acknowledges that the probation officers in this case did not need a warrant to search his home. However, Crawford alleges that the probation officers' search of the gun safe was unreasonable. Crawford cites *United States v. Korte*, 918 F.3d 750, 754 (9th Cir. 2019), for the proposition that property is only subject to parole search when there is a sufficiently strong connection to the property to demonstrate that the parolee has control over it. (Doc. 26 at 16.) Crawford claims that his denial of ownership and access to the safe combined with Gilbreath's statements regarding the safe and the firearms in the vehicle to the officers in Helena were sufficient to demonstrate that he lacked control over the safe. Consequently, Crawford claims that the probation officers lacked reasonable grounds to perform the search and attribute the firearms to him. (*Id.*) The Court does not agree.

The probation officers in this case knew that Crawford had just been arrested after being found within arm's reach of firearms after leaving a known drug trafficking location outside of his permitted area of travel. The probation officers had also received information from a trusted source that Crawford was involved in dealing drugs and "always carries a weapon on him." (Doc. 28-3 at 47.) Additionally, upon entering the home, the officers discovered loose ammunition, among evidence of other violations. Then, upon entering Crawford's bedroom,

they discovered a large gun safe.  Based on all of these facts, the Court finds that the probation officers had much more than reasonable cause to believe that the gun safe within Crawford's bedroom contained guns.  In other words, the probation officers had reasonable cause to believe that they would discover evidence of a parole violation within the gun safe.

The Court now turns to the specific question of whether or not the probation officers had reasonable cause to believe that the property that is the gun safe was within Crawford's control.  First, the Court finds Crawford's reliance on *Korte* to be misplaced.  The statement relied upon by Crawford stems from *United States v. Granberry*, 730 F.3d 968, 981–982 (9th Cir. 2013), in which the Ninth Circuit held that when considering whether or not real property was under the control of a parolee, and thus subject to a California parole condition allowing the search of property under the parolee's control, there needed to be probable cause to believe that the residence was within the parolee's control.  Here, we are not dealing with a search of real property or California law.  The Court is satisfied that probation officers may search property when they have "reasonable suspicion that an item is owned, possessed, or controlled by the parolee or probationer."  *United States v. Bolivar*, 670 F.3d 1091, 1095 (9th Cir. 2012) (quotation mark omitted); *see also*

*State v. Fritz*, 142 P.3d 806, 808–09 (Mont. 2006) (requiring only reasonable cause to believe the vehicle searched was in defendant's control).

Second, the probation officers had reasonable suspicion to believe that the safe was within Crawford's control, despite his claims to the contrary. First, the safe was in his bedroom. Second, Gilbreath arrived at the home before the safe was removed and disclaimed ownership of the safe. Probation officers are charged with more than enforcing conditions of supervision, they are also charged with "discerning any deception by the probationer." *State v. Moody*, 148 P.3d 662, 666 (Mont. 2006). Accordingly, probation officers should not be "bound by the responses of persons with the greatest incentive to lie about ownership, possession, or control." *United States v. Davis*, 932 F.2d 752, 760 (9th Cir. 1991). Based on the facts presented here, probation officers were justifiably unconvinced by Crawford's claim that he did not own the safe and did not have access to it. Consequently, the search of the safe did not violate the Fourth Amendment.[1]

---

[1] To the extent that Crawford asserts that the search was unreasonable because it was not performed in the "least demeaning" manner, his argument lacks merit. (Doc. 26 at 15–17.) The probation officers obtained access to the residence and the safe by climbing through an open window, they did not break in. Further, although the officers did kick in the door to the garage, that happened after the safe had been discovered in the home. Therefore, the discovery of the safe cannot derive from any issue with the search of the garage. *See U.S. v. Ankeny*, 502 F.3d 829, 837 (9th Cir. 2007) (finding suppression inappropriate remedy in the absence of a causal nexus between unreasonable search and discovery of evidence).

## II.    Crawford's arrest.

Crawford next challenges the grounds upon which he was arrested on July 18, 2018, in addition to claiming that the probation officers failed to comply with a procedural requirement established by Montana statute for the detention of parolees.  Crawford claims that both of these problems make his arrest illegal and require the suppression of all evidence seized during the arrest.

### a.  Grounds for the arrest.

Federal courts look to "state law to determine the lawfulness of an arrest by a state officer for a state offense." *United States v. Shephard*, 21 F.3d 933, 936 (9th Cir. 1994).  Here, Crawford was arrested by state probation officers for violating the conditions of his parole.  Accordingly, the propriety of his arrest is a matter of state law.  Under Montana law, a parole officer may arrest a parolee upon reasonable grounds to believe that a parolee has committed acts that constitute a violation of his parole conditions.  *State v. Plouffe*, 646 P.2d 533, 386–87 (Mont. 1982) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972)).  Relevant here, evidence in a federal prosecution "must be suppressed if it was the product of an arrest illegal under state law." *Shephard*, 21 F.3d at 938.

Crawford first claims that the probation officers lacked reasonable grounds to arrest him based upon the firearms discovered in the safe because the guns were

Gilbreath's and he did not have access to them. The Court does not agree. First, it has not been established that the guns were, in fact, Gilbreath's. Gilbreath did not demonstrate a level of knowledge of firearms during the stop in Helena when she could not provide any more information regarding the type of firearm in the vehicle beyond its being "the cool one." As was discussed above, the Court does not attribute any error to the probative value the probation officers' attributed to Crawford's and Gilbreath's statements concerning her ownership of the firearms. Moreover, the other evidence contained in the safe—Crawford's banking documents, a bill of sale, and a service receipt—does not tend to show that the firearms and safe belonged to Gilbreath. This leads to the second problem here, the other evidence contained in the safe assuredly provided the probation officers with reasonable grounds to believe that Crawford had access to the safe. Crawford's assertions that he didn't have access to the safe ring particularly hollow when the safe contained numerous documents addressed to Crawford.

The discovery of guns in the safe and the evidence that Crawford had access to them is a blatant violation of the conditions of his parole and provides adequate grounds upon which the probation officers could arrest him. Based on this finding, the Court will not go on to address Crawford's argument concerning Probation Officer Barrett's reliance on the unfounded allegation that Crawford had assaulted

his girlfriend.  The guns in the safe were enough to justify his arrest and, as stated

by Barrett, the information about the assault was "[n]othing, really," and he "never

really delved much into it" because he believed he had "enough reasonable

suspicion" without it.  (Doc. 28-3 at 13.)

### b.  Violation of Montana law.

Again, this Court must determine whether the arrest complied with state law.

*Shephard*, 21 F.3d at 936.  As noted by Crawford, the arrest of an alleged parole

violator must be completed in conformance with the Montana statute providing the

probation officers the authority to do so.  Montana Code Annotated § 46–23–

1023(2) provides the following:

> Any probation and parole officer may arrest the parolee without a
> warrant *or* may deputize any other officer with power to arrest to do
> so by giving the officer oral authorization *and* within 12 hours
> delivering to the place of detention a written statement setting forth
> that the parolee has, in the judgment of the probation and parole
> officer, violated the conditions of the parolee's release.  A written
> statement or oral authorization delivered with the parolee by the
> arresting officer to the official in charge of the institution from which
> the parolee was released or other place of detention is sufficient
> warrant for the detention of the parolee or conditional releasee if the
> probation and parole officer delivers a written statement within 12
> hours of the arrest.  *The probation and parole officer, after making an
> arrest, shall present to the detaining authorities a similar statement of
> the circumstances of the violation.*

(emphasis added).

Crawford asserts that his arrest fell afoul of this statutory requirement in three ways: 1) no arresting probation officer supplied a written statement of the circumstances of the violation to the detention center but, instead, Probation Officer Blando completed that task; 2) Probation Officer Blando's written statement was late because it was delivered to the detention center nearly twelve-and-a-half hours after Crawford's arrest; and 3) the written statement, a warrant to arrest parolee, did not cover the alleged violation leading to the arrest, it covered the charges stemming from the arrest itself. (Doc. 26 at 25–27.) Crawford argues that pursuant to the Ninth Circuit's decision in *United States v. Shephard*, 21 F.3d 933 (9th Cir. 1994), the gun discovered during his arrest must be suppressed because its discovery was "inextricably intertwined" with the illegal arrest. (Doc. 26 at 25–28.)

As an initial matter, the statute only requires a written statement within twelve hours when a probation officer is deputizing another law enforcement officer to make the arrest, as made clear by the use of the conjunctive *or*.[2]

---

[2] Crawford claims that *State v. Rossbach*, 378 P.3d 1160 (Mont. 2016), establishes that the probation officer must submit a written statement within twelve hours. (Doc. 29 at 9–10.) However, it is not clear that the probation officer was the individual to perform the arrest at issue in *Rossbach*. The probation officer delivered an authorization to arrest to the Lake County Detention Center 36 hours before Rossbach's arrest. *Rossbach*, 378 P.3d at 1161. Presumably, Lake County then arrested Rossbach, which would explain why the twelve-hour requirement was at issue. But, this is not clear. Nonetheless, the Court will not read in a twelve-hour requirement where the plain language of the statute does not require one, particularly in light of this uncertainty in Crawford's cited authority.

Although Butte-Silver Bow Parole and Probation may have a department policy of submitting a written statement within twelve hours, it is the duty of the Court to ensure compliance with Montana law, not department policy.

Nonetheless, when a probation officer makes the arrest, the statute still requires a "similar statement." Here, the "similar statement" was written by Probation Officer Blando the following morning and states that Crawford was charged with numerous crimes, including unlawful possession of a firearm. (Doc. 26-18 at 1.) Although the Government contends that this accurately described the parole condition violation which justified the arrest in the first place, the Court agrees with Crawford that its placement in a catalogue of crimes stemming from the arrest, as well as its classification as being "Charged" as a "FELONY," would indicate that it is a description of the crime charged at the scene, not the reason for the arrest. Further, the statute as written appears to require the arresting probation officer to complete the written statement, not just any probation officer. (Doc. 26-18 at 1.) Nonetheless, the Court need not conclusively decide these issues because the Court does not find that any of the potential statutory violations raised by Crawford justify suppression.

The United States Supreme Court has "rejected a 'but for' test for determining whether evidence form an illegal arrest must be suppressed."

*Shephard*, 21 F.3d at 939. "Rather, the inquiry is whether the police obtained the evidence 'by exploitation of the illegality.'" *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)). The Ninth Circuit in *Shephard* applied a three-factor test to determine whether the illegality of an arrest warranted suppression of evidence subsequent to that arrest. As stated in *Shephard*:

> First, we consider the proximity of the illegal arrest with the seizure of the evidence. Second, we consider whether there were independent intervening events that led the police to the evidence. Third, we consider the effect of the suppression on the exclusionary rule's purpose of deterring police misconduct.

21 F.3d at 938–39. Here, the Court finds the first factor to be determinative.

Looking to the proximity of the illegal arrest with the seizure of the evidence, the Court notes that the focus is on the causal connection between the illegality and the evidence." *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1990) (citing *Wong Sun*, 371 U.S. at 488)). There "must be a sufficiently close relationship between the illegal arrest and the seizure to necessitate suppression." *Shephard*, 21 F.3d at 939. Here, the arrest and seizure of the evidence occurred well before any potential illegality arose. As discussed above, the probation officers had the requisite reasonable grounds to perform an arrest. The potential illegality Crawford complains of occurred much later, when a non-arresting probation officer delivered a written statement that did not discuss the

reasonable grounds supporting the arrest. Consequently, there is not a causal connection between the illegality and the discovery of the evidence and the Court cannot find a sufficiently close relationship between the insufficient report and the discovery of the evidence to necessitate suppression.

Moreover, the Montana Supreme Court has established the appropriate remedy for non-compliance with the written statement requirement. In *State v. Rossbach*, 378 P.3d 1160, 1162 (Mont. 2016), the Montana Supreme Court found that the purpose of the written statement requirement imposed in the sister statute to Montana Code Annotated § 46–23–1023(2), § 46–23–1012(2), which is substantially identical but applies to the arrest of probationers, "is to give the detention center timely written authority to hold the probationer, and does not impose an additional due process obligation upon the probation officer for the benefit of the defendant." Accordingly, if the written statement is somehow insufficient, the detention facility would be free to release the prisoner." *Id.* at 1062, n. 1. This is because the written statement does not justify the arrest itself, it justifies the continued detention of the parolee.

Despite Crawford's assertions to the contrary, this is not a case in which the grounds upon he was arrested "have never been explained or documented." (Doc. 26 at 27.) Although the warrant authorizing detention does not clearly articulate

the reasons the probation officers believed Crawford had violated his parole, the transcripts of the extensive interviews conducted of all of the arresting probation officers that have been submitted in this case, as well as the hearing testimony by Probation Officers Blando and Barrett, all share a common justification for the arrest: the contents discovered in the safe made it clear that Crawford had access to firearms in violation of his parole conditions. (Docs. 28-1 at 41–42; 28-2 at 43–44; 28-3 at 5–7.) Again, the Court does not find an issue with the grounds or the manner of Crawford's arrest. Any potential problem arose the next day with the delivery of the written statement. There is neither a proximal or causal connection between the inadequacies in the subsequent report and the prior discovery of the evidence. Accordingly,

IT IS ORDERED that Crawford's Motion (Doc. 25) is DENIED.

IT IS FURTHER ORDERED that the jury trial in this matter is set for July 8, 2019, at 9:00 a.m. in the Russell Smith Federal Courthouse, Missoula, Montana. The plea agreement deadline is set for June 27, 2019. The JERS deadline is set for July 1, 2019. Jury instructions and trial briefs are due on or before July 3, 2019.

DATED this 21st day of June, 2019.


Dana L. Christensen, Chief District Judge
United States District Court